25 C.C.P.A. (Patents)

## HARTLEY v. JOYCE.
### Patent Appeal No. 3880.

Court of Customs and Patent Appeals.
April 25, 1938.

Strauch & Hoffman, of Washington, D. C. (James A. Hoffman, of Washington, D. C., of counsel), for appellant.

George W. Hansen, of Chicago, Ill. (Edwin R. Hutchinson, of Washington, D. C., of counsel) for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal in an interference proceeding wherein the Board of Appeals of the United States Patent Office affirmed a decision of the Examiner of Interferences awarding priority of invention upon the counts here involved to appellee.

The counts in issue, which originate in the application of Joyce, the senior party, are as follows:

"1. A pressure gauge comprising a post formed with a longitudinally extending bore for a portion of its length and with a transverse passage therethrough beyond the longitudinal bore, a Bourdon tube having one end connected to the transverse passage, the free end being movable in response to pressure therein, a tubular element arranged with its opposite ends connected in communication with the longitudinal bore and the transverse passage, respectively, an intermediate portion of said tubular element being disposed in spaced relation with respect to said transverse passage and bore to provide a trap for confining liquid between the free end of said Bourdon tube and the pressure receiving end of said tubular element.

"2. A pressure gauge comprising a post having a bore formed therein and a passage extending therethrough, a pressure responsive element communicating at one of its ends with said passage, the opposite end being movable in response to pressure therein, a tubular member arranged with its opposite ends in communication with said bore and passage respectively, a portion of said tubular member being disposed in spaced relation with respect to said passage to provide a trap for confining liquid between the ends of said pressure responsive element and said tubular member."

The interference arises between the application of appellee, Joyce, filed May 13, 1932, and assigned to the James P. Marsh Corporation, and an application of appellant, Hartley, filed April 10, 1934, and assigned to the United States Gauge Company. Appellant is the junior party and has the burden of proving priority of invention by a preponderance of the evidence.

The interference was declared originally between the application of Joyce and a joint application of Klein and Tollefsen assigned to the United States Gauge Company. The joint application was afterwards converted to a sole application of Klein. Prior to the approval of the preliminary statements, the application of Hartley was substituted for the application of Klein at the request of the common assignee.

Neither the Klein and Tollefsen application nor the sole application of Klein is in the record. Both Klein and Hartley are employees of the United States Gauge Company, Hartley being a subordinate of Klein.

The details of the steam gauge here involved we think are clearly described by the Primary Examiner as follows: "The interfering counts involve a pressure gauge of the Bourdon tube type provided with a trap for confining liquid therein to prevent steam or other heated medium from entering the pressure responsive element and affecting said element, yet will allow said pressure responsive element to respond to pressure applied thereto. The pressure gauge comprises a post having an axial passageway which communicates with a short transverse passage with one end of a tube coiled to form a substantially complete convolution, the opposite end of the tube is secured to and in communication with one end of a passage which extends transversely through the post. A Bourdon tube communicates at its open end with the opposite end of to the transverse passage and the closed end thereof is adapted to be connected with motion transmission mechanism to actuate a pointer. The end portion of the coiled tube and the open end portion of the Bourdon tube in communication with the transverse passage together with said transverse passage form a trap for holding a quantity of liquid and thereby keep live steam or other heated medium away from the Bourdon tube while at the same time

the liquid in the trap transmits applied pressure to the Bourdon tube."

The trap mentioned in the above description is also called a "syphon."

Both parties took testimony. Appellant in his preliminary statement alleged that he conceived the invention and disclosed it to others on or about April 9, 1930, and reduced it to practice on or about April 17, 1930.

The preliminary statement of appellee alleged that he conceived the invention, disclosed it to others, and reduced it to practice in the early part of the year 1932.

The Board affirmed the holding of the Examiner of Interferences that the evidence established conception by appellee on January 13, 1932, and reduction to practice in the same month. Appellant does not challenge this holding.

The Patent Office tribunals decided that although appellant's evidence established conception in April, 1930, he had not reduced the invention to practice prior to January 13, 1932, and that appellant was not diligent in reducing to practice from a time just prior to January 13, 1932, up to the time he filed his application, April 10, 1934.

The Board also held with the Examiner of Interferences as follows: "The Hartley invention was concealed and entirely forgotten and the making of a similar invention by other inventors, even though assigned to the same assignee as the Hartley application was later assigned, cannot inure to Hartley's benefit and avoid the application of the Mason and Hepburn doctrine."

The only witnesses appearing for appellant, Hartley, were himself and the said Klein.

Hartley is an experimental engineer employed since 1928 by the United States Gauge Company, and engaged in developing for the company items which are embraced in the gauge industry. Prior to April, 1930, the time when he conceived the idea of placing the trap or syphon inside the casing of the gauge, his employer company made various kinds of gauges. Among these was a syphon steam pressure gauge, the construction of which called for the syphon as a separate unit to be fastened and placed externally to the gauge casing. This kind of syphon was either in pigtail or ball form. In the month of April, 1930, the witness Klein, chief engineer of the United States Gauge Company, under whose supervision Hartley worked, brought to Hartley a sketch of an improvement in the ball syphon marked ASK–1155. This sketch gave Hartley the idea of locating the trap or syphon within the gauge casing and he made a pencil drawing of this idea, marked ASK–1155–A, which bears the date of April 9, 1930. This drawing discloses the invention in issue. On the same date Hartley made a pencil drawing of another steam pressure gauge marked ASK–1155–B. This drawing does not disclose the invention herein.

Gauge models were made from the said Hartley drawings and are known as Hartley Exhibits Nos. 7 and 8. Evidence concerning the making of these models consists of an original and carbon duplicate shop order issued April 24, 1930. The order reads, "Experimental work on inside syphon gauges as per sketches ASK-1155, etc." It is signed by M. Klein and indicates the work was completed May 20, 1930. Hartley relies upon the making and testing of the model, Exhibit No. 7, as his reduction to practice.

Both Hartley and Klein testified that after the aforesaid models were completed they were placed at the same time on a steam sterilizer, remaining thereon with the sterilizer running night and day for two weeks. Hartley says the steam pressure to which the gauges were constantly subjected during this test was between 35 and 45 pounds. Klein says the pressure was from 35 to 40 pounds. The pressure on each gauge must have been the same. The dials of the gauges are not the same, one being calibrated from zero to 30 pounds, and the other from zero to 50 pounds, and both, while in evidence, are detached from the gauges. Neither Hartley nor Klein could say which of the dials was on either model.

It is important in this controversy to know which of the dials was on Exhibit No. 7, which supports the counts herein during said test. Either dial, as far as the record discloses, might have been on Exhibit No. 7. It does not seem reasonable that a test of a 30-pound gauge would be made under the pressures testified to, particularly in view of the evidence that gauges should not be subjected to pressure of more than half the total calibration. The same reasoning applies to the test on the 50-pound gauge. It does not seem to us to be possible to have made a proper test of these two gauges in the way that has been testified.

The purpose of the syphon, which contains liquid separating the live steam from the Bourdon tube, as we understand it, is to save the said tube and soldered joints connected with it from excessive heat by which they would be damaged. The damage temperature, as stated by Hartley, would begin in the neighborhood of 300° F. Concerning this phase of the test the Board stated as follows: "No temperature readings were made during the test so that it is not known whether the gauge would withstand a temperature of 300° F. and over. The Examiner of Interferences pointed out that the purpose of the so-called syphon, which constitutes the present invention, was to protect the Bourdon element and associated soldered joints from excessively high temperatures. Hence to test the invention it was necessary to raise the temperature to at least 300' F. where it would be damaged when the syphon was not present. There is no proof that the temperature was raised sufficiently high to injure the gauge and that the syphon prevented damage to the Bourdon tube under the high temperature."

Hartley states that a steam pressure of 45 pounds corresponds to about 300° F. The Examiner of Interferences sets forth that this pressure, according to the steam tables showing relation between pressure and heat, is approximately 292', and that a pressure of 30 pounds corresponds to about 275'. From this he holds that: "It will thus be seen that even if everything to which Hartley testifies be accepted as proved, it would not be satisfactorily established that exhibit 7 was tested in such a way as to show that the syphon was effective in keeping down the temperature of the Bourdon tube."

There is no contention here that the device is so simple and its efficacy so obvious and capable of practical use that it did not need an actual test in order to sufficiently reduce it to practice. All the Hartley testimony on this score is intended to show that it was necessary to test the gauge, and that the test was sufficient.

Both Hartley and Klein testified from memory as to the details of events which occurred more than five years after the drawings and model gauges were made. The testimony of Klein in corroborating that of Hartley on the point of reduction to practice was necessarily of a rather limited character since he observed the sterilizer only occasionally, and took no readings. He differed from Hartley as to the highest pressure used. It is not difficult to understand, in a business in which both witnesses are engaged for the United States Gauge Company, with many experiments on different gauges constantly absorbing their attention, how they could be mistaken in their testimony regarding reduction to practice of Exhibit No. 7.

We are of opinion that the decisions of the Patent Office tribunals, which held that the evidence is insufficient to establish reduction to practice of Exhibit No. 7, reached the correct conclusion.

From the evidence in this case we believe that appellant has not established diligence in reducing to practice from a time just prior to January 13, 1932, up to the time he filed his application, April 10, 1934.

It appears that after the test was made on the gauge, Exhibit No. 7, in May, 1930, it was put away in a storeroom in the basement and apparently forgotten until in February, 1934, when Hartley recalled it and brought it to the attention of Klein. This was when Hartley learned from Klein that the Klein and Tollefsen application had been filed. Hartley's application was not filed until after the interference had been declared between the application of Joyce and the application of Klein and Tollefsen. We cannot find where anything had been done with Hartley's device within this time, nor was the invention in issue disclosed to anyone outside his company. Mr. Place, president of the United States Gauge Company, it is said, was told about the Hartley gauge and he suggested that "tooling up" be deferred until a market was found and that the gauge be held for further reference. Mr. Place was not called as a witness, although he had complete authority in matters pertaining to patents for his company. It appears that Hartley, on September 22, 1931, discussed with Mr. Jewell, chief engineer of the American Sterilizer Company, the installation of an internal syphon having a drainable steam trap. Neither the drawing (Hartley Exhibit No. 5) nor the gauge (Hartley Exhibit No. 7) was brought to the attention of Jewell, although it would seem the most natural thing to do. Subsequent to the Hartley and Jewell meeting, Hartley made a rough sketch on the back of a letter for Klein to indicate one of the ideas he told Klein he had discussed with Jewell, which said sketch, Hartley Exhibit No. 11, is said to come within the scope of the counts. We

cannot say, because of the crudity of the sketch, that it discloses the invention in issue. In any event, it seems that Jewell never saw the sketch and he was not called as a witness to tell what was said or disclosed by Hartley. Therefore, we are of opinion that Hartley Exhibit No. 11 should be given no weight.

We do not believe that Hartley Exhibit No. 13, bearing the date of February 24, 1932, which is a sketch reading on the present counts, is proof of diligence on the part of Hartley nor on the part of his assignee with respect to the Hartley invention. It was not made by Hartley, nor was it considered as his invention. On the contrary, the application on it was filed by Klein and Tollefsen.

. The making public of Exhibit No. 13 by Klein and Tollefsen or the common assignee we do not think can relieve Hartley or the common assignee of the duty of proceeding diligently in connection with the Hartley invention. There is some other evidence claimed by appellant to support his contention of activity which we have carefully examined but find unnecessary to discuss for the reason we think it cannot be considered as pertinent to the issue here. As far as the Patent Office is concerned, it is immaterial that Klein and Hartley have a common assignee. The applications are separate entities and the patent proceedings in each, so far as this case is concerned, are to be conducted as though there was no common assignee.

Here the common assignee for the purpose of an interference proceeding deliberately substituted the Hartley application for a joint application by Klein and Tollefsen which had been converted to a sole application of Klein. As we see it, Hartley and his assignee must stand on the merits of the Hartley application. Whatever had been done with respect to the other commonly owned application can have nothing to do with the invention of the issue counts.

We are of opinion that the Examiner of Interferences correctly ruled on this question as follows: "While no authority directly in point has been found, there seems to be no sound reason why the activity of one inventor should inure to the benefit of another merely because they are employed by the same company. Certainly a reduction to practice by one of two independent inventors who happened to be thus employed could not be tacked on to an earlier conception by the other in order to defeat a third party. It is the purpose of interferences to determine priority between inventors rather than interests. An inventor may, of course, derive benefit from work done by others on his invention, even though he, personally, does not participate in it. *In the present case, however, Klein and Tollefsen did not consider that they were working on Hartley's invention but that they were making one of their own. That they did not recognize any debt to Hartley is apparent from Klein's testimony (x Q. 102) that he considered the device of the joint application to be 'the only patentable feature'* and also from the fact that the application as filed contained claims (1 and 3 for example) which were directly readable on the Hartley 1930 device. Such claims clearly would not have been included if Klein and Tollefsen had considered their work merely an improvement over this device." (Italics ours.)

In our opinion, neither Hartley nor his assignee exercised diligence to reduce his invention to practice during the period from a time just prior to January 13, 1932, up to the filing date of his application April 10, 1934. In fact they did nothing at all with the Hartley invention during that period.

In view of our conclusion it is not necessary to discuss the applicability of the doctrine of Mason v. Hepburn, 13 App.D.C. 86, which was referred to in the decisions of the patent tribunals.

For the reasons herein stated, the decision of the Board of Appeals is affirmed.

Affirmed.